

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-21-00346-CV

_____

IN THE INTEREST OF J.M. AND J.M., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-587871-15

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Memorandum Opinion by Justice Wallach

# MEMORANDUM OPINION

Appellants S.H. (Mother) and I.M. (Father) appeal from the trial court's decree terminating their parental rights to their children, J.M. (James) and J.M. (Julien) (collectively, the children).[1] In six issues and five issues respectively, Mother and Father challenge the trial court's denial of Father's motion for extension and for continuance, the legal and factually sufficiency of the termination grounds, and the legal and factual sufficiency to support the trial court's best-interest finding. Because we hold that sufficient evidence supports the termination and that the trial court did not abuse its discretion by denying Father's extension motion, we affirm.

## I. Background

On October 6, 2020, the Department of Family and Protective Services (the Department) filed a petition seeking termination of Mother's and Father's parental rights to James and Julien. In support of the petition, the Department attached an affidavit from Department caseworker Virginia Olger explaining how the Department became involved with the children. The affidavit stated that in 2019, the Department had received a referral stating that Mother had fought with Father and had been taken to jail and charged with assault. A caseworker tested Mother and Father for drugs, and both tests were positive for cocaine and marijuana. The children were placed with their

---

[1]To protect the privacy of the children and the parties, we use initials and pseudonyms for their names. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

paternal grandmother (Grandmother) under a parental child safety placement (PCSP)[2] as part of the Department's providing family-based safety services (FBSS) to the family.[3] The affidavit further explained the steps that Olger had taken since July 2019 to get the parents to perform their services under the FBSS service plan, their progress—or, mostly, their lack thereof—on those services; each parent's continued drug use; and Grandmother's ill health and her unwillingness or inability to keep Mother from taking the children for periods of time against Department instructions. The Department concluded that the children could not be protected under the FBSS plan, and it therefore filed this suit to become the children's temporary conservator.

---

[2]A PCSP is a temporary out-of-home placement of a child with the child's relative or with someone who has a long-standing and significant relationship with the child's family. Tex. Fam. Code Ann. § 264.901(2). When Department staff determine that a child cannot safely stay with a parent, a PCSP may be used as an alternative to the Department's seeking conservatorship. Department of Family & Protective Services, Parental Child Safety Placement (PCSP) Resource Guide, at 3 (Sept. 2018), *available at* http://www.dfps.state.tx.us/handbooks/cps/Resource_Guides/PCSP_Resource_Gu ide.pdf (last visited Mar. 16, 2022).

[3]Family-based safety services are protective services that the Department provides to a family when a child in the family is at risk of abuse or neglect but is not in the Department's conservatorship. The Department provides these services to protect the child from abuse and neglect, to help the family reduce the risk of future abuse or neglect, and to prevent the child's removal from the family's home. 40 Tex. Admin. Code § 700.710–.712. As with cases in which the Department has conservatorship, the Department develops a written service plan for the family. *Id.* § 700.716. If a family does not participate in the services to address dangers to the child, the Department will consider seeking removal of the child. *Id.* § 700.718, .722.

In the initial permanency hearing order, the trial court noted that the dismissal date for the suit was October 11, 2021 and that the case was set for trial on September 15, 2021; the trial date was subsequently changed to September 20, 2021. On August 11, 2021, Father filed a "Motion for Continuance and Motion for Extension of Time" (Extension Motion) seeking to continue the trial setting and to extend the case's automatic dismissal date. Father stated that he had been incarcerated since March 2021 in the Glossbrenner Unit, a substance abuse felony punishment facility in the Texas Department of Criminal Justice, and that he was scheduled to be released to a halfway house once his treatment was completed. He asked for "an opportunity to complete the service plan once he is released and [to] demonstrate his sobriety and ability to care for his children." He asserted that under Family Code Section 263.401, the trial court could consider Father's good faith effort to successfully complete a substance abuse treatment program. The associate judge who considered the Extension Motion denied it but told Father that he could reassert it after his release.

Father re-urged the motion at a hearing held the morning of trial. The trial court denied the motion, and the case proceeded to a bench trial at which Department caseworkers, Father, and Father's adult daughter Y.M. (Yvonne) testified. The trial court subsequently signed an order terminating Mother's parental rights on the termination grounds listed in Family Code Subsections 161.001(b)(1)(D), (E), (N), and

(O) and terminating Father's parental rights based on the grounds in Subsections (D), (E), and (O).[4] They both now appeal.

## II. No abuse of discretion from denial of continuance

### A. Applicable law

Father's first issue challenges the trial court's denying of his Extension Motion, as does Mother's first issue. Both parents argue that the trial court applied the wrong version of Family Code Section 263.401, which sets out the circumstances under which the trial court's jurisdiction over a termination suit may be extended beyond the original dismissal date.

Generally, the deadline for beginning a termination trial is the Monday following the first anniversary of the day that the trial court appointed the Department as the child's temporary managing conservator. *See* Tex. Fam. Code Ann. § 263.401(a). However, if a trial on the merits has not commenced within that time, the court may grant an extension and retain the case on its docket if the court makes two findings: (1) extraordinary circumstances necessitate continuing the Department's temporary managing conservatorship and (2) continuing it is in the child's best interest. *Id.*

---

[4]In setting out the Subsection (O) termination ground, the order states that the court had found by clear and convincing evidence that Father had "failed to comply with the provisions of a court order that specifically established the actions necessary for *the mother* to obtain the return of the children." [Emphasis added.] This reference to "the mother" appears to be a typo, but because we affirm on a different termination ground, the use of that language is immaterial to our disposition.

§ 263.401(b). In determining whether extraordinary circumstances exist in a case in which a parent has been ordered to complete a substance abuse treatment program, the trial court must consider whether the parent made a good faith effort to successfully complete the program. *Id.* § 263.401(b-2). Further, under Subsection (b-3), a court *must* find that extraordinary circumstances exist if

> (1) a parent of a child has made a good faith effort to successfully complete the service plan but needs additional time; and

> (2) on completion of the service plan the court intends to order the child returned to the parent.

*Id.* § 263.401(b-3). "We review a trial court's decision to grant or deny an extension of the dismissal date under the abuse of discretion standard." *In re A.J.M.*, 375 S.W.3d 599, 604 (Tex. App.—Fort Worth 2012, pet. denied) (en banc op. on reh'g).

When the Department filed its termination petition, the statute did not include Subsection (b-3), and the subsection does not apply retroactively. Act of April 28, 2021, 87th Leg., R.S., ch. 8, H.B. 567, §§ 9, 15. The trial court nevertheless applied that subsection when ruling on Father's Extension Motion; at the hearing, the trial court stated that in order to grant an extension, it had to make the findings required under Subsection (b-3) and that it could not do so. On appeal, Mother and Father argue that the trial court abused its discretion by applying Subsection (b-3).

**B. The trial court did not abuse its discretion by denying the Extension Motion.**

Regarding the part of Father's motion seeking an extension, the trial court's reliance on Subsection (b-3) is not reversible error. Neither parent objected that the trial court was using the wrong version of Section 263.401, and thus they both failed to preserve their argument that the trial court should not have applied Subsection (b-3). *See* Tex. R. App. P. 33.1; *In re Guardianship of Laroe*, No. 05-15-01006-CV, 2017 WL 511156, at *20 (Tex. App.—Dallas Feb. 8, 2017, pet. denied) (mem. op.) (holding party waived challenge to retroactive application of statute when no objection made in trial court); *Tex. Moto-Plex, Inc. v. Phelps*, No. 11-03-00336-CV, 2006 WL 246520, at *10 (Tex. App.—Eastland Feb. 2, 2006, no pet.) (mem. op.) (holding appellant did not preserve its argument that amended version of statute applied because it made no objection in trial court). Further, "even if a trial court reaches the right result for the wrong reason, if the record supports the trial court's ruling on any of the grounds before it, the trial court has not abused its discretion." *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *4 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.). Because,

as we discuss next, Father failed to show extraordinary circumstances, the court's reliance on Subsection (b-3) does not require a reversal.[5] *See id.*

Father asserts that he established extraordinary circumstances and best interest under the applicable version of Section 263.401 because he completed drug treatment in jail, attended substance abuse and anger management classes while incarcerated, was taking an anger management class in his halfway house, and has a job, and because his children are attached to him. Father also challenges the trial court's denial of the continuance part of his motion, arguing that although the trial court stated at the hearing that Father's motion was not supported by an affidavit as required by Civil Procedure Rule 251, "[Father]'s motion indeed contained an affidavit by his counsel."

The children were removed from Mother and Father and taken into the Department's care in October 2020. Father turned himself in to law enforcement on January 25, 2021. Father failed to complete his services in the time between the

---

[5]The trial court appeared to believe that it could grant an extension *only* if it could make the findings under Subsection (b-3). However, other statements by the trial court suggested that it would not have granted the motion even without considering that subsection; the trial court expressed that Father had "done nothing, or remotely very little" on his service plan, and the court pointed out several times that Father had been incarcerated for committing family violence. Further, the trial court granted the termination in part on the endangerment ground under Family Code Section 161.001(b)(1)(E), and the endangerment finding was supported by Father's drug use and domestic violence, acts that the trial court could have considered in its endangerment and best-interest analyses even if Father had had time to complete his services. *Cf. In re M.M.F.*, No. 2-08-014-CV, 2008 WL 5265033, at *13 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.).

children's removal in early October 2020 and his reporting to law enforcement. In March 2021, he was moved from the Tarrant County Jail to the Glossbrenner Unit. Father was released on probation to a halfway house on September 1, 2021.

In the summer of 2020, before the children were removed from Father's care, he had begun participation in a substance abuse program, but he was discharged before he finished because, he said, "there was this argument between me and this other guy."[6] Father subsequently completed a substance abuse treatment program while confined in the Glossbrenner Unit. With the exception of that treatment, however, Father did not begin complying with the service plan[7] until a few weeks before trial. Father had almost four months before reporting to law enforcement to begin working on his services, but he did not do so.

Father's inability to complete services because of and after his incarceration was the consequence of his own actions, and "actions that are considered to be the parent's fault will generally not constitute extraordinary circumstances." *See In re M.S.*, 602 S.W.3d 676, 680 (Tex. App.—Texarkana 2020, no pet.) (cleaned up); *see also C.G.*, 2020

---

[6]Other testimony suggested that Father went to the drug rehabilitation center in late 2019. Regardless, he attempted the program after the Department's involvement but before the children were removed from his care.

[7]Under the FBSS plan that was in place before the children's October 2020 removal, Father completed a parenting class, and as noted, completed part of a substance abuse treatment program. Until his incarceration, however, he did not complete any of the court-ordered services required of him after the children's removal.

WL 4518590, at *3 (stating that "parents cannot blunder their way into extraordinary circumstances"); *In re R.J.B.*, No. 05-17-01411-CV, 2018 WL 1755540, at *2 (Tex. App.—Dallas Apr. 12, 2018, no pet.) (mem. op.) (stating parent's incarceration generally considered parent's fault and not extraordinary circumstance). Accordingly, Father's belated attempt to comply with his service plan requirements in the few weeks before trial and his wanting more time to work his services is not an extraordinary circumstance. *See M.S.*, 602 S.W.3d at 680. Father complains that the trial court apparently did not apply Subsection (b-2) by considering that Father "had indeed completed a drug treatment program in the Glossbrenner facility." However, that subsection did not *require* the trial court to grant Father an extension; it requires only that the trial court *consider* Father's effort to complete a treatment program. In light of the evidence the trial court had before it, we cannot say that the trial court abused its discretion by denying Father's extension request.

With respect to the continuance request part of the motion, the trial court was correct that the motion did not contain an affidavit. It did, however, contain his attorney's unsworn declaration, which satisfies Civil Procedure Rule 251. *See* Tex. R. Civ. P. 251 (requiring continuance motion to be supported by affidavit, consent of parties, or operation of law); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 132.001 (stating unsworn declaration may be used in lieu of verification, certification, or affidavit). Father's brief does not include any arguments about the "sufficient cause" requirement for granting a continuance under Rule 251, focusing instead on whether there were

10

extraordinary circumstances for granting an extension under Section 263.401. *See* Tex. R. Civ. P. 251 ("No . . . continuance [shall] be granted except for sufficient cause supported by affidavit, or by consent of the parties, or by operation of law."). We thus assume that Father relies on the same facts to show both good cause for a continuance and extraordinary circumstances to grant an extension. The trial court did not abuse its discretion in determining that, under the circumstances, Father had not shown sufficient cause to justify a continuance. *See, e.g., In re S.W.*, No. 2-08-164-CV, 2008 WL 4531711, at *3 (Tex. App.—Fort Worth Oct. 9, 2008, no pet.) (mem. op.); *see also In re M.D.W.*, No. 02-13-00013-CV, 2013 WL 3326664, at *3–4 (Tex. App.—Fort Worth June 27, 2013, pet. denied) (per curiam) (mem. op.). Further, granting a continuance would have required the trial court to extend the dismissal deadline, which, as we have explained, the trial court was not required to do. We overrule Father's first issue.

Mother also failed to show that the trial court abused its discretion by not granting her a continuance or an extension. Mother's brief argues that the trial court's reliance on Subsection (b-3) was incorrect, but not only did she not preserve that argument, she does not address the trial court's stated reasons for denying her motion. The trial court did not deny her motion based on Subsection (b-3). Instead, the trial court denied her oral motion for continuance on the basis that Mother had not made a written motion for continuance under Rule 251. *See* Tex. R. Civ. P. 251. As for her extension request, the trial court stated that she had neither filed a written motion for extension nor put on any testimony "other than argument for the record for the Court

11

of Appeals, so there's nothing for [the court] to consider"—in other words, that Mother failed to provide any evidence of extraordinary circumstances.

The trial court was correct that Mother did not file a written motion for a continuance, and the Department did not agree to a continuance. Accordingly, the trial court did not abuse its discretion by denying her a continuance. *See id.*; *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at \*12 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.); *In re J.P.-L.*, 592 S.W.3d 559, 576 (Tex. App.—Fort Worth 2019, pet. denied). The trial court was also correct that Mother offered nothing on which the court could have based a finding of extraordinary circumstances. She filed no written motion explaining why an extension should be granted and offered no evidence at the hearing that would support an extraordinary circumstances finding, and a trial court does not abuse its discretion by denying an extension motion that is unsupported by evidence of extraordinary circumstances. *In re C.F.*, No. 07-21-00158-CV, 2021 WL 6125571, at \*3 (Tex. App.—Amarillo Dec. 28, 2021, pet. denied) (mem. op.); *D.J. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-20-00454-CV, 2021 WL 822491, at \*9 (Tex. App.—Austin Mar. 3, 2021, no pet.) (mem. op. on reh'g); *In re R.H.*, No. 02-19-00273-CV, 2019 WL 6767804, at \*3 (Tex. App.—Fort Worth Dec. 12, 2019, pet. denied) (mem. op.).

Mother's attorney did include some factual assertions in arguing to the court in support of an extension. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (noting that unsworn, unobjected-to factual statements by attorneys can constitute evidence).

However, even if the trial court considered those arguments as evidence, the trial court did not abuse its discretion by denying the extension. Mother's attorney argued,

> And I have—my client has been homeless and transportation problems, phone problems, everything. And we would like to piggyback on top of [Father's Extension Motion] asking for an extension in terms of my client. Also she has—we're looking at—she's ready to go into SafeHaven or One Safe Place.
>
> She's—in June, she did—there's another case that opened up in this—with another baby in May[8] of this year, I think—I believe it was April—I'm sorry—and the baby was taken also.
>
> And she did start to do services in June. Things have gone downhill with a visitation problem, and she hasn't been able to see her kids since then. She's ready to start.
>
> We're also looking at, Your Honor, that—that second case that was opened up. That's a baby. These—the baby and the children are now in the same home. And we're asking that the termination on the older children, which is why we're here today, be given an extension because she can begin working and continue her services and everything and—and do what she needs to do and still be seeing the baby that's still in the same home.
>
> And our—I guess our plea to the Court is that there's no need to rush to terminate here if we can get one or both of these parents to work things out for these kids.

Mother's attorney did not explain when Mother's housing and transportation problems began, what she did to attempt to resolve those problems, whether Mother completed or attempted any services before those problems developed, or whether any

---

[8]As noted later in this opinion, Mother had a baby in April 2021, and that baby was taken into the Department's care the same month and placed in the same foster home as the children.

of those problems arose from Mother's fault. Further, none of the argument addressed the children's best interest. *See, e.g.*, *B.K.*, 2021 WL 5848769, at \*12 (stating that actions that are considered to be the parent's fault generally will not constitute an extraordinary circumstance); *In re R.D.*, No. 02-21-00125-CV, 2021 WL 4204999, at \*5 (Tex. App.—Fort Worth Sept. 16, 2021, no pet.) (mem. op.).

Further, to the extent that Mother argues that an extension should have been granted based on Father's written Extension Motion, even if she can challenge on appeal the denial of another party's motion, we have already held the trial court did not abuse its discretion by denying that motion. We overrule Mother's first issue.

### III. No abuse of discretion in termination

In their remaining issues, Mother and Father challenge the evidentiary sufficiency to support the termination grounds and the trial court's best-interest finding. In addressing these issues, we first set out the relevant trial evidence and then analyze whether that evidence supports termination.

#### A. Standard of review

For a trial court to terminate a parent–child relationship, the Department must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or

14

conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

To determine whether the evidence is legally sufficient in parental-termination cases, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We disregard all evidence that a reasonable factfinder could have disbelieved, and we consider undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *See id.*

In evaluating the evidence's factual sufficiency to support termination, we must perform "an exacting review of the entire record." *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). Nevertheless, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We review the whole record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the termination grounds. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19.

**B. The evidence relevant to termination**

### 1. Caseworker Virginia Olger's testimony and the Department's exhibits

Olger, the caseworker who had been involved in the family's FBSS case before the children's removal, testified first. Olger stated that she became involved with the family at the end of June 2019. The Department was concerned about Mother's drug use and an act of domestic violence toward Father. Olger set up family-based services for Mother and Father. By the time that Olger became involved, the children were living with Grandmother. Between June 2019 and the end of September, neither parent participated in the FBSS. Mother participated in one drug test in September 2019, but Father did not submit to drug testing in that time.

Between October and December 2019, Mother completed a domestic violence program and underwent a drug assessment. She was referred to the North Texas Addiction Center but attended only one session. Father completed his parenting class, and, at some point, enrolled in a program at a drug rehabilitation center, but as previously noted, he did not complete the program. Both parents acknowledged that they used drugs, but Father did not participate in random drug testing. Father attempted to participate in counseling, but he was discharged from that as well for reasons not specified at trial.

In February 2020, Grandmother began having health problems, and the Department looked for other possible placements for the children. The Department

left the children with Grandmother, however, because the children's paternal aunt (Aunt) agreed to help Grandmother care for the children.

In April or May 2020, Mother was arrested,[9] but she was released from custody in time for a June 2020 virtual meeting that Olger held with the family to talk about how the case was progressing. At that point, the Department was "going to try to close the case in an open PCSP"—meaning that the children would stay with Grandmother, who would supervise the parents, and Grandmother would get help from Aunt. During that meeting, Mother admitted that she had used methamphetamine, marijuana, and cocaine and had consumed alcohol to excess and that her drug use was ongoing. Father admitted to ongoing use of the same substances.

Shortly after that meeting, Father was arrested for committing domestic violence against Mother. The children did not witness Father assaulting Mother but did witness the beginning of the altercation, in which Father accused Mother of having sex with someone else. Between June and July 2020, the parents did not participate in any services. Olger testified that by around July 2020, she was having trouble contacting Mother. Asked if Father had contact with Mother around that time, Olger stated that "[i]t was hard to know" because "[h]e would say that [Mother] would call him from different numbers." Father did, however, tell Olger that Mother had flattened his vehicle's tires.

_____

[9]We assume that the arrest was for an alleged theft offense discussed below.

17

Meanwhile, Grandmother's health deteriorated, and she was hospitalized. In August 2020, the Department requested that the children be removed from Mother and Father's care and placed under the Department's temporary conservatorship because the caseworker who was planning to take over the case from Olger contacted Grandmother, who told the caseworker that the children were with Mother. The Department then learned that Grandmother had allowed Mother to take the children on several other occasions. The Department became concerned that Grandmother could not adequately protect the children. The children were taken into the Department's care in October 2020. Around that time, Father was placed on deferred adjudication for assault–family violence for the assault against Mother after the June 2020 meeting with Olger and for a previous April 2020 assault against her. *See* Tex. Penal Code Ann. § 22.01(b)(2)(A), (B). Father admitted that he was still using drugs around this time, and the Department was still having difficulty contacting Mother.

After Olger's testimony, the trial court admitted the Department's trial exhibits. The Department introduced the initial status report to the court that it had filed in the case and the initial status hearing order, in which the trial court found that Mother and Father had reviewed and understood the service plan. Regarding Mother, the Department introduced exhibits relating to Mother's alleged criminal acts committed since the Department's involvement with the family. In June 2019, Mother was convicted for a January 2019 misdemeanor assault causing bodily injury (presumably the domestic violence incident against Father) for which she was sentenced to four days'

18

confinement in the Tarrant County Jail. On April 27, 2020—during the FBSS case— Mother was charged by information with theft of property with a value of more than $100 but less than $750, which she allegedly committed that same month. On July 1, 2021, Mother was charged by information for theft of property with a value of more than $100 but less than $750, an offense allegedly committed on December 13, 2020, after the children had been removed from her care. On August 19, 2021, the State indicted Mother for an alleged April 15, 2021 unauthorized use of a vehicle. The Department also introduced a September 2, 2021 judgment nisi stating that Mother had failed to appear for trial on the unauthorized use of a vehicle charge.

The trial court also admitted the Department's exhibits relating to Father's criminal history. In 2012, Father was sentenced to thirty days' confinement in the Tarrant County Jail for a misdemeanor assault–family violence offense committed against Mother. The Department further introduced the orders of deferred adjudication for Father's April 2020 and June 2020 assault–family violence allegations against Mother. The indictment for the April 2020 offense alleged that Father had intentionally, knowingly, or recklessly impeded Mother's normal breathing or blood circulation. The indictment for the June 2020 offense alleged that Father had hit or struck Mother with his hands.[10]

---

[10]The indictment also alleged that Father had used or exhibited a deadly weapon—either a rock or a brick—during the offense, but the State waived that count under a plea agreement.

## 2. Caseworker Makayla Roberson's testimony

The Department's next witness was Makayla Roberson, an employee with Our Community Our Kids (OCOK), an organization that provides conservatorship services on the Department's behalf. Roberson began working on the case when the children were taken into care in October 2020. Roberson testified that she developed a service plan for Mother and Father.[11] The plan required Mother to randomly drug test at least once a month, to complete a substance abuse assessment, and to follow any

[11]The Department was required to file a service plan with the court no later than forty-five days after the trial court signed the order appointing the Department as the temporary managing conservator. *See* Tex. Fam. Code Ann. § 263.101. Despite that statutory requirement, no document entitled "service plan" was ever filed with the trial court clerk or admitted as evidence at trial. However, the Department included in a status report to the court the steps that the parents needed to take and the services they needed to complete. Moreover, neither party complains about the Department's failure to file a service plan, Roberson testified without objection about actions that Mother and Father had to take to obtain the children's return, and the trial court's status hearing order stated that Mother and Father had reviewed the plan and understood what they needed to do. *See In re V.A.G.*, No. 04-19-00449-CV, 2019 WL 5927451, at *2–3 (Tex. App.—San Antonio Nov. 13, 2019, no pet.) (mem. op.). Father and Mother did not object in the trial court that the service plan was not specific enough or that they were unable to understand what steps they needed to take for the return of their children. On appeal, however, Father argues that termination could not be granted on Subsection 161.001(b)(1)(O) because some services in the order—"engage in individual counseling throughout his legal case until he is successfully discharged by his counselor" and "engage in BIPP services and provide the worker with a Certificate of Completion once the course is completed"—were not specific enough. Even if we agreed that those two provisions were not specific enough to support termination under Subsection (O), we would not reach a different result because (1) we do not affirm the termination on the Subsection (O) ground and (2) Father does not argue that the provision most relevant here—the one requiring him to submit to random drug testing when requested by the caseworker, to submit to a drug and alcohol assessment, and to follow any recommendations suggested after that assessment—was not specific enough.

20

recommendations made in that assessment. She was further asked to complete a domestic violence course for women and to participate in parenting classes. Roberson testified that she reviewed the service plan with Mother, who said she understood it. As of the trial date, the only parts of the plan with which Mother had complied were her substance abuse assessment and visits with the children. The report from the assessment recommended that Mother participate in an outpatient drug treatment program, but she did not do so. Mother never participated in random drug testing. In April 2021, Mother gave birth to another child—also a boy (Father is not the baby's father)—and at the time of the baby's birth, both Mother and the baby tested positive for methamphetamine and marijuana. The baby was removed from Mother's care, and at some point, the Department was able to place the baby and James and Julien in the same foster home.

Roberson discussed Mother's criminal charges and her assault–bodily injury conviction. She then explained that Mother had stopped visiting the children after May 2021 because of a court order arising out of a visitation that Mother had had with the children and the new baby. At the visit, the baby's father, who also attended the visit, became "aggressive and hostile," threatened to take the baby, and then got into an altercation with police. Mother then left the building after asking how to exit through a backdoor because she was avoiding the police due to an outstanding warrant. After that, the trial court ordered Mother's visits with the children stopped and told Mother that

if she wanted to resume visitations, she needed to have her attorney set a hearing on the matter. The visits were never resumed.

Roberson stated that the Department was asking the trial court to terminate Mother's parental rights because Mother had failed to complete her service plan, endangered the children through her conduct and put the children in endangering conditions, had pending criminal charges, and had continued her drug use. She also testified that Mother had constructively abandoned the children by not visiting since May 2021 and not requesting the trial court to authorize continued visitation. She stated that terminating Mother's parental rights was in the children's best interest because Mother had not demonstrated any change since the children's removal.

Roberson further testified on cross-examination that Mother told her about having transportation problems, but Roberson stated that Mother could have used public transportation to access her services. The last time Mother had spoken to Roberson about visitation was the Monday or Tuesday before trial, when Mother called, said that she had been "on the streets" and was then in a motel or a hotel, and asked about the children and her services.

As for Father, Roberson testified that Father's service plan required him to undergo individual counseling, random drug testing, domestic violence classes, a psychological assessment, and a substance abuse assessment and to follow any recommendations from those assessments. Prior to his turning himself into law enforcement in January 2021, Father consistently visited the children but did not

complete any services or submit to any drug testing, despite Roberson explaining to him that a failure to test would be viewed by the Department as a positive result. During Father's incarceration, he participated in an anger management course and a substance abuse treatment program. Roberson testified that the Department was requesting that Father's parental rights be terminated because he had engaged in endangering conduct and put the children in endangering conditions and had failed to comply with service plan provisions.

Roberson testified that in Father's visits with the children, he was always appropriate with them, and the children and Father seemed bonded and attached to each other. Roberson conceded that Father had made progress in addressing "the issues that he's had in his life," but she nevertheless believed that terminating his rights was in the children's best interest.[12] Although Father completed the substance abuse program while incarcerated, Roberson still had concerns about his maintaining his sobriety. She explained, "[p]arents always are sober when they're in drug treatment or in drug facilities in prison." On cross-examination by the children's attorney ad litem,

---

[12]Father points out that at one point in Roberson's testimony, when asked if she believed that it was in the children's best interest to not have a relationship with Father anymore, rather than responding that she personally had that belief, she responded, "I represent the Department and our stance is to oppose the extension." However, in a different part of her testimony, when she was questioned about whether she was asking that Father's rights be terminated, the question was phrased whether it was "because *you* believe that's in the children's best interest." She responded, "Yes." [Emphasis added.]

23

Roberson expressed concern that Father had attended (though not completed) drug treatment before his incarceration and had not stayed off drugs after that treatment.

Roberson said that Father had recently provided her with a plan for what he wanted for the children, but she also stated that at the time of trial, neither parent could "truly parent based on what's going on in their life today," and she did not believe it was fair to the children "to keep having to wait for their parents."

On re-cross, Roberson agreed it would affect the children if Mother's rights to them were terminated but they knew that Mother was still having visits with their baby brother.

### 3. Roberson's supervisor Ramon Hodridge's testimony

Ramon Hodridge, a permanency supervisor at OCOK who supervised Roberson in this case, testified next. He stated that the Department was requesting termination of Mother's and Father's rights "[d]ue to the length of Child Protection Service and OCOK being involved in the case, with us not seeing any progress being—a substantial progress being made by either one of the parents" and that the Department believed "it would be in the best interests of the children to have the parental rights terminated." He pointed out both parents' failure to complete their services during the FBSS case and stated that "even through the life of this conservatorship case, a lot of things have not been completed and are still needing to be done [and so] the route we're going for permanency for the kids would actually be in their best interests." He explained that "[t]he longer kids are in CPS care, then normally we start to see other issues that come

through the kids. And so it is normally in the best interests to find permanency for the kids in a safe and loving environment." He stated that the Department has a good permanency plan for the children and that the children are in a loving foster home and are bonded to the foster parents. Hodridge further stated that the foster parents are open to allowing the children to have contact with Grandmother and with their older half-siblings—Yvonne, Father's twenty-two-year-old daughter, and M.M., Father's nineteen-year-old daughter, both from Father's former marriage.

On cross-examination, Hodridge acknowledged that he had not met with the children, who were ten and six years old at the time of trial, to see how they felt about the decision. Asked if Roberson had expressed reticence about the termination process because the children were bonded to their father, he replied that "[s]he had just expressed that the boys do love their father." He agreed that the children knowing that their Mother was still visiting their baby brother while that termination case was pending "may have an impact" on them. However, he also stated that "this just entire CPS process . . . has as well." He stated that the Department "would also make sure that we also have therapy and counseling set up for them to help them understand what is taking place."

### 4. Father testified about progress.

Father testified that even if his rights were to be terminated, "I still plan on staying clean, getting my apartment, getting my car, doing everything I have to do. Just 'cause I get terminated, that don't mean I'm going to go back to that life I used to be,

25

you know." He stated that "before all this happened," he "really did" have a good life. He testified that when he and Mother ended their relationship, "I started doing more and more drugs . . . . The kids got taken away. I started—you know, it was so hard for me. I mean, everything came at one time. Hit me. Lost my apartment. Lost my truck. Lost my job." Asked to explain his thinking at the time, he said, "I—it was just everything going on and, you know, I didn't know what to do, so I started doing drugs." He described his time in prison as "a wake-up call." At the time of trial, he was living in a halfway house. Describing his routine, he stated, "I go to my classes. Wake up. Then I go to work. Trying to get situated. Get back on my feet. You know, just like I said, getting my apartment, getting my car, you know." One of the classes he has taken since incarceration was an anger management class, and he felt that he was more pulled together and calmer now than he was before. He felt in control of his emotions. He testified that the children love him and are attached to him and Grandmother. He acknowledged, however, that he did not send the children any cards or letters while incarcerated. He stated that he and Mother do not talk, and he can still maintain that distance from her and raise the children.

On cross-examination, Father testified that he had never been incarcerated that long before and never wants to be again; "I never want to go back to that no more." He acknowledged that he had been convicted of assaulting Mother in March 2011, while she was pregnant with James. He was arrested in 2020 for choking her that April and assaulting her again in June. He received deferred adjudication for those assaults. The

June assault was after the FBSS family conference was held. He violated his probation by using methamphetamine, resulting in his incarceration in January 2021 and, starting in March 2021, his time at the Glossbrenner Unit. He stated that he could stay clean now. He knew before his incarceration that he needed help, and so he was glad that he went through treatment.

### 5. Father's adult daughter

Yvonne testified that while Father was at Glossbrenner, he wrote to her often and told her to tell the children hello and that he loved them. Since his release from incarceration, he is "a more positive person and more happy person." In his two visits with the children since his release, the children were "very happy" to see him. Yvonne stated that Father and the children have a "strong bond." She testified that termination would be hard on the children because they are close to Father and believe they will be returning to live with him:

> I think right now since my dad got out, they are thinking they're going to come home to him. So I think once they find out that they're not going to come home to him, I think it's going to affect them a lot because—well, they—they're really smart boys, and I think they know—I don't know how to say this. I just think it will—it will affect them a lot because—I mean, they're really close to my dad. And since all three of them were always together, like, when my dad was raising them—them two, I just think it will affect them a lot because of how the bond is . . . .

She testified that the children seemed happy in their foster home, "[b]ut I also think when they see us they want to come home with us. I think they'd rather be with their

family." Yvonne stated that Father raised her, her sister, and her half-sister (Father's step-daughter) and is a good father.

**6. The CASA report, permanency report, and status hearing order**

The trial court took judicial notice of the CASA advocate's report[13] to the court, which had been filed a few days before trial. The report described the basis for the children's removal, including Mother's and Father's ongoing drug use during the FBSS case, Mother's arrests, Father's assault against Mother in June 2020, and the fact Mother took the children from Grandmother multiple times against the Department's instructions. The report noted that since the children were removed, Mother had not completed her parenting classes or individual counseling or participated in drug testing or a domestic violence support group, as required by her service plan. As for Father, the report noted that he had reported completing some classes in prison, but as of the time of the last permanency report, he had not provided the caseworker with any verification that he had completed any classes. The CASA advocate recommended that the court terminate Mother's and Father's parental rights.

The last permanency report to the court was filed in July 2021. The report stated what services the parents were supposed to have completed and what their progress had been. Regarding Mother, the report noted that she had not initiated the services

---

[13]On appeal, Father argues that the trial court could not take judicial notice of the CASA report because it contains hearsay and unsworn statements. However, Father did not object at trial to the trial court's taking judicial notice. *See* Tex. R. App. P. 33.1.

that she had been ordered to complete, which included parenting classes, random drug tests, individual counseling, and a domestic violence support group. The report noted that Father was at that time incarcerated and had not yet completed parenting classes,[14] random drug testing, or individual counseling. It stated that Father's services would resume once he returned from incarceration. Like the CASA report, it stated that Father had claimed to have completed classes while incarcerated, but he had not as of that time provided any verification. At trial, Roberson acknowledged that Father had provided her with some certificates of "some things he completed while he was incarcerated," but she did not remember what all of the certificates were for and did not bring them to trial with her. Father did not produce any copies of the certificates as evidence. Roberson did, however, remember that Father had completed an anger management course and a 12-week substance abuse program while at Glossbrenner.

In the status hearing order, the trial court found that Mother had reviewed the service plan and understood it and "had been advised that unless she is willing and able to provide the children with a safe environment, even with the assistance of a service plan, within the reasonable period of time specified in the plan," the children might not be returned to her, and her parental rights could be terminated. The trial court made the same finding regarding Father.

---

[14]That is, he had not completed a parenting class as part of the service plan put in place after the children's removal. Father did complete a parenting class under the FBSS plan.

## C. Evidence supports termination under (b)(1)(E).

The trial court terminated Mother's and Father's parental rights in part on the grounds listed in Subsections (D) and (E) of Section 161.001(b)(1). If a trial court's termination is based on (D) or (E), an appellate court must review those grounds when raised on appeal—even if other grounds would support termination—because a termination on either of those grounds has collateral consequences for the parent's relationship with other children the parent may have in the future. *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.).

Subsection (D) focuses on the child's environment and permits termination when the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings [that] endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection (E) focuses on the parent's behavior and permits termination when the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct [that] endangers the physical or emotional well-being of the child," when termination is in the child's best interest. *Id.* § 161.001(b)(1)(E). "Endanger" in this context means "to expose to loss or injury, to jeopardize." *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.) (citing *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), and *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)).

The relevant inquiry under (E) is "whether evidence exists that the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *Id.* Termination under Subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *J.T.G.*, 121 S.W.3d at 125. However, the parent's conduct need not be directed at the child or actually cause the child injury; "[t]he specific danger to the child's well-being may be inferred from parental misconduct standing alone." *M.B.*, 2015 WL 4380868, at *12. Courts may consider a parent's conduct that occurred outside the child's presence or after the child's removal by the Department. *In re M.S.*, No. 02-20-00147-CV, 2020 WL 6066400, at *4 (Tex. App.—Fort Worth Oct. 15, 2020, no pet.) (mem. op.); *In re R.S.*, No. 02-15-00137-CV, 2015 WL 5770530, at *6 (Tex. App.—Fort Worth Oct. 1, 2015, no pet.) (mem. op.). "As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being." *M.B.*, 2015 WL 4380868, at *12.

A trial court may consider a parent's failure to complete a service plan as part of its endangering-conduct analysis. *Id.* (citing *In re R.F.*, 115 S.W.3d 804, 811 (Tex. App.—Dallas 2003, no pet.)). Further, "illegal drug use after a child's removal or during the pendency of a termination proceeding is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct under [S]ubsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied); *see In re J.A.G.*, No. 02-10-00002-CV, 2010 WL 4539442, at *1 (Tex. App.—Fort Worth

31

Nov. 10, 2010, no pet.) (mem. op.) ("A parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding that the parent engaged in conduct that endangered the child's physical or emotional well-being." (quoting *In re J.W.*, No. 02-08-00211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.))). Although an endangerment finding based on evidence that a parent has used an illegal substance is not automatic, *C.V.L.*, 591 S.W.3d at 751, a parent's illegal drug use "exposes the child to the possibility that the parent may be impaired or imprisoned." *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (cleaned up).

### 1. Evidence supports terminating Mother's rights under Subsection (E).

Mother's only argument regarding the Subsection (D) and (E) grounds is that there is no evidence of Mother's living conditions at the time of trial or how the living conditions posed a threat to the children. The Department presented some evidence, albeit vague, of Mother's living arrangements, which we discuss below. However, even without evidence of Mother's living conditions, the Department presented sufficient evidence of endangerment.

Mother failed to submit to random drug testing, from which the trial court could have concluded that any drug test would have had a positive result. *See In re T.R.L.*, No. 10-14-00290-CV, 2015 WL 1020865, at *5 (Tex. App.—Waco Mar. 5, 2015, no pet.) (mem. op.). Further, when Mother gave birth to a baby in April 2021, both she

32

and the baby tested positive for methamphetamine and marijuana. *See E.R.W.*, 528 S.W.3d at 264; *see also In re D.C.*, No. 05-19-01217-CV, 2020 WL 1042692, at *10 (Tex. App.—Dallas Mar. 4, 2020, pet. denied) (upholding endangerment finding when mother admitted she used drugs multiple times during the termination case's pendency and refused to submit to monthly drug tests). Not only did Mother use drugs during the pendency of the termination suit when she was at risk of losing the children, she also used drugs while pregnant with another child. Her drug use is conduct that supports a finding that she engaged in conduct that endangered the children's physical or emotional well-being. *See J.A.G.*, 2010 WL 4539442, at *1; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g); *see also C.V.L.*, 591 S.W.3d at 751.

Mother failed to complete most of her required services, including the drug treatment program recommended after her drug assessment. *See M.B.*, 2015 WL 4380868, at *12 (citing *R.F.*, 115 S.W.3d at 811). Although Roberson testified vaguely that Mother had told her that she had experienced some transportation issues, Mother presented no evidence that she was unable to comply with specific provisions of the trial court's order requiring her to complete services or that she made a good faith effort to comply with the order and her failure to comply was not her fault. *See* Tex. Fam. Code Ann. § 161.001(d). Roberson also had trouble reaching Mother after the children's removal, despite calling multiple numbers that Mother had provided as contact numbers. Roberson stated that shortly before trial, Mother called and told her "that she

33

had been on the streets, and [that] she was trying to help people on the streets." In that conversation, she asked Roberson how the children were doing and finally asked about services. She was at that time living in a motel or hotel. In other words, Mother waited until essentially the eve of trial to show interest in performing her services.

The Department also presented evidence that she had been convicted in 2019 for an assault against Father. As we discuss below, domestic violence is endangering conduct. Mother was also charged with a theft offense allegedly committed during the FBSS case and an unauthorized use of a motor vehicle offense allegedly committed during the case's pendency. She was in jail for a short time after her arrest for one of the offenses, and then, when she appeared at trial, she was arrested on an outstanding warrant that had been issued after her bond was revoked. Regardless of whether Mother was guilty of the charged offenses, by not appearing for trial on the authorized-vehicle-use offense, she subjected the children "to the probability that [they] will be left alone because [their] parent [wa]s once again jailed," conduct that the trial court could consider in its analysis. *See In re M.M.M.*, No. 01-21-00269-CV, 2021 WL 5365102, at *11 (Tex. App.—Houston [1st Dist.] Nov. 18, 2021, pet. denied) (mem. op.) (cleaned up). We hold that the evidence was legally and factually sufficient to enable the trial court to form a firm belief or conviction that Mother had engaged in conduct that endangered the children. We overrule Mother's third issue. Having upheld the Subsection (E) ground, we do not address Mother's second, fourth, and fifth issues challenging the Subsection (D), (N), and (O) grounds.

## 2. Evidence supports terminating Father's rights under Subsection (E).

After the Department became involved through the FBSS case, and still after the children were removed from his care, Father continued to use drugs until his incarceration prevented him from doing so, despite his having participated in and nearly completed a drug treatment program. Father was discharged from that program after an argument with another man, suggesting, at least that at that point in his life, he lacked self-control. Further, during the pendency of the case, Father was incarcerated. "[I]mprisonment alone is not a basis to terminate a parent's rights," but "it is an appropriate factor to consider because when a parent is incarcerated, he or she is absent from the child's daily life and unable to provide support to the child, negatively impacting the child's living environment and emotional well-being." *M.R.J.M.*, 280 S.W.3d at 503. Father had been placed on deferred adjudication, giving him the opportunity to be present for his children, complete his drug treatment program, submit to random drug testing, and establish a stable home environment for the children, but his probation was revoked during this suit's pendency based on Father's continued methamphetamine use.[15] *See J.A.G.*, 2010 WL 4539442, at *1. Thus, Father's continued drug use led directly to his confinement and separation from his children.

---

[15]Father claimed that he "was keeping clean" while on probation because he knew he had to report to his probation officer and that no test was taken to prove that he had violated his probation by using drugs. However, in another part of his testimony, when asked what drugs he had used between October 2020 and January 2021, he answered, "Methamphetamine." The trial court did not have to believe Father's

Additionally, the offenses for which Father was incarcerated were assaults against Mother. Father's April 2020 assault against Mother involved him choking her. He assaulted her again just a few months later. There is no evidence that the children witnessed Father assault Mother, but they did witness him instigate the April 2020 altercation with Mother over her relationship with another man. Father had also previously been convicted for assaulting Mother in 2011—while she was pregnant with James. Family violence endangers children even when the children are not present, and the court could consider Father's assaults in its analysis even though they occurred before the Department removed the children. *See E.R.W.*, 528 S.W.3d at 265; *see also M.M.M.*, 2021 WL 5365102, at *10 (noting that "[w]hile direct physical abuse clearly endangers a child, domestic violence, want of self-control, and a propensity for violence may also be considered as evidence of endangerment" and that "[e]vidence that a parent has engaged in abusive or violent conduct in the past permits an inference that the violent behavior will continue in the future").

In his brief, Father downplays his drug use and family violence, describing the incidents as "disturbing" but also stating that "[t]here was no evidence that [James and Julien] suffered any physical or emotional trauma in regard to [Father's] drug use or

---

statement that he did not use drugs in violation of his probation conditions. *See In re J.L.*, No. 02-21-00131-CV, 2021 WL 4621753, at *8 (Tex. App.—Fort Worth Oct. 7, 2021, pet. denied) (mem. op.)

commission of family violence of a misdemeanor nature."[16] He acknowledges, however, that neither Subsection (D) nor Subsection (E) require the Department to prove actual trauma to children. *See M.B.*, 2015 WL 4380868, at *12.

Father argues, however, that there must be a causal connection between his drug use and the children's endangerment. Father's continued drug use resulted in his incarceration, and his inability to stop using drugs despite his near completion of a treatment program and the children's removal from his home showed that he prioritized his drug use over providing the children with a stable home.

Since his release from the Glossbrenner Unit, Father has stayed sober, is attending anger management and relationship classes in his halfway house, and has obtained a job, and while he was incarcerated, he attended anger management and substance abuse classes. He testified that the classes he took helped him change how he acts and reacts, and since his release from prison, he feels in control of his emotions.

---

[16]Father asserts that his assaults against Mother during the FBSS case "were charged as felonies only because of the misdemeanor in 2011." This assertion does not help Father. First, the Penal Code makes an assault offense a third degree felony when it is committed against a family member or person with whom the defendant had a dating relationship and *either* the defendant had previously been convicted of family violence *or* the offense was committed "by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth," which is what the State alleged that Father did in this case. *See* Tex. Penal Code Ann. § 22.01(b)(2). Second, Father does not argue that the trial court could not determine that three incidents of domestic violence, including one while Mother was pregnant, demonstrated an endangering pattern of behavior.

"[A] parent's efforts to improve or enhance parenting skills are also relevant in determining whether a parent's conduct results in endangerment under [S]ubsection (E)." *M.M.M.*, 2021 WL 5365102, at *11. However, "evidence of improved conduct, especially of short duration, does not conclusively negate the probative value of a long history of irresponsible choices." *Id.* (cleaned up). The Department showed that since it became involved with the children in June 2019, Father's drug use remained unchanged until his incarceration, and he demonstrated a pattern of domestic violence. Father's improvement in the short period between his release from prison and the trial date is admirable, but it does not negate the clear and convincing evidence that he previously endangered the children.

Father cites to *In re M.P.* for the proposition that his drug use does not support an endangerment finding because there was no evidence as to when, how often, or where Father used drugs, and thus it was possible that he used the substances away from the children. *See* 618 S.W.3d 88, 104 (Tex. App.—Houston [14th Dist.] 2020) (stating that there was no evidence of when or where the father had used illegal substances and that it was "entirely possible" that the father had used the substances away from the child or even before she was born), *judgment rev'd on other grounds*, No. 21-0360, 2022 WL 333363 (Tex. Feb. 4, 2022). In *M.P.*, a father's four-week-old daughter was taken into the Department's care after she was taken to the hospital for bleeding in her brain, and while there, she tested positive for cocaine and methamphetamine. *Id.* at 95. Around the time his daughter was taken into care, the father had a negative urinalysis

for drugs but admitted that he could not pass a hair follicle test for marijuana and methamphetamine. *Id.* The child's mother's hair follicle test was also positive for methamphetamine. *Id.* The *M.P.* court concluded that the evidence was legally sufficient to show that the father's actions endangered his daughter but that, although the daughter had tested positive for the same substances that the father admitted to using, the evidence was not factually sufficient to show endangerment. *Id.* at 106. We are not bound by another court of appeals' precedent. We do agree with the *M.P.* court that evidence that a parent has used illegal substances at some point does not automatically equate to endangerment, *id.* at 104, but we disagree with Father that the evidence in this case, when viewed in a neutral light, was not enough to allow the trial court to form a firm belief or conviction that Father endangered the children.

Based on the record evidence, the evidence was legally and factually sufficient for the trial court to form a firm belief or conviction that Father endangered the children's physical or emotional well-being. We overrule Father's third issue. Accordingly, we do not reach Father's second and fourth issues, which challenge the Subsection (D) and (O) termination grounds.

### D. Best Interest

Finally, we consider Father's fifth issue and Mother's sixth issue, which challenge the trial court's best-interest findings.

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is

39

child-centered, focusing on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). In determining whether evidence is sufficient to support a best-interest finding, we review the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 249; *C.H.*, 89 S.W.3d at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2). We also consider the evidence in light of nonexclusive factors that the factfinder may apply in determining the child's best interest:

> (A) the [child's] desires . . . ;
>
> (B) the [child's] emotional and physical needs[,] . . . now and in the future;
>
> (C) the emotional and physical danger to the child now and in the future;
>
> (D) the parental abilities of the individuals seeking custody;
>
> (E) the programs available to assist these individuals to promote the [child's] best interest . . . ;
>
> (F) the plans for the child by these individuals or[, if applicable,] by the agency seeking custody;
>
> (G) the stability of the home or proposed placement;
>
> (H) the [parent's] acts or omissions . . . indicat[ing] that the existing parent–child relationship is not a proper one; and
>
> (I) any excuse for the [parent's] acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best-interest finding, "we consider, among other evidence, the *Holley* factors" (footnote omitted)); *E.N.C.*, 384 S.W.3d at 807.

These factors are not exhaustive, and some listed factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *Id.* Additionally, Family Code Section 263.307 lists factors that "should be considered by the court and the [D]epartment in determining whether the child's parents are willing and able to provide the child with a safe environment." Tex. Fam. Code Ann. § 263.307(b). In considering those factors, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." *Id.* § 263.307(a).

### 1. Mother

In her brief, Mother argues that she had transportation issues throughout the case and was the victim of domestic violence and that it could affect James and Julien if her rights to them are terminated while she still has parental rights to the baby and that termination is therefore not in the children's best interest. We disagree.

Mother did not comply with random drug testing and did not participate in a drug treatment program. Mother continued to use drugs after her children were taken into care, including using drugs while pregnant. *See In re Z.F.*, No. 07-21-00138-CV, 2021 WL 5770174, at *6 (Tex. App.—Amarillo Dec. 6, 2021, no pet.) (mem. op.). Further, Mother did not provide her caseworker with any evidence that she had a stable home for the children to live in or a stable job to support them. To the contrary, the limited testimony about Mother's living arrangements suggested that she did not have a stable home. Mother's pending criminal charges mean that Mother faces potential

41

incarceration—and she was in fact arrested at trial on a warrant related to her criminal charges—and there was no evidence showing how Mother planned to take care of the children, whether she was incarcerated or not. *See C.H.*, 89 S.W.3d at 28 (considering in best-interest analysis fact that parent had no concrete plan to provide emotional or physical care for child). This evidence weighs in favor of termination being in the children's best interest.

Finally, while the caseworker testified that James and Julien may be affected by the fact that Mother still has visits with their baby brother, there was little testimony about the relationship between Mother and the children. There was, however, testimony that James and Julien are doing well in their foster home, that they are bonded to their foster parents, and that their foster parents are willing to adopt them. *See id.* (stating evidence of adoption plans are relevant to best interest). Based on this record, the evidence was legally and factually sufficient for the trial court to form a firm belief or conviction that terminating Mother's parental rights was in the children's best interest. We overrule Mother's sixth issue.

### 2. Father

In support of his best-interest argument, Father points to evidence of the following testimony:

- there was no mention of the children having any physical or mental vulnerabilities, and they were old enough to be aware of their

surroundings; the children were in their third foster placement;[17] the children are bonded to Father and, according to Yvonne, want to and were expecting to be able to live with Father once he was released;

- the Department agreed that if Mother's parental rights were terminated to them but not to their baby brother, it may need to provide counseling to the children to explain the situation;

- there was no evidence that the children were ever physically or emotionally harmed in Father's care, although Mother and Father both committed domestic violence against the other; Father's assaults against Mother were not witnessed by the children; Father completed a parenting class during the FBSS case and has taken anger management classes; and Father discontinued his relationship with Mother over a year before trial;

- there was no evidence to indicate that Father would not provide adequate care to the children; Father was not questioned about his exact plans for the children, but he testified that he anticipates keeping his job and obtaining an apartment and a car, and Roberson testified that Father had provided her with a plan for his children; Father had previously demonstrated an ability to provide a stable home in raising his older two

---

[17]The children were removed from their second home and placed in the third home so that they could be in the same home as their baby brother.

daughters, and Father was the children's primary caretaker when he had them in his custody and therefore understood the children's needs and capabilities; Father has Grandmother and his two older daughters as a support system; and although Hodridge testified that children can be harmed the longer that they are in the care of the Department, if Father was able to obtain suitable housing soon after his release from the halfway house, this potential problem would be solved; and

- although Father had had a drug problem, Father completed a substance abuse program while incarcerated and testified that he plans to stay sober; Father made no excuses for his actions before the Department's intervention; Yvonne testified that Father is more positive now; and Father has made progress in addressing his issues through programs in jail and in the halfway house.

Father further asserted that the trial court could assume that Father would continue to participate in any programs required by the Department based on his taking advantage of the programs offered at the Glossbrenner Unit and the halfway house.

We hold that the trial court's best-interest finding was sufficiently supported by the evidence. With respect to the children's bond with Father, Roberson testified that the children love their Father, and the children and Father appeared to be bonded. However, Hodridge testified that the children are also bonded to their foster family. The foster parents want to adopt the children, and their doing so would make the

children's placement permanent. The foster parents had also indicated that they were "very open" to facilitating contact between the children and the children's older half-sisters and Grandmother, and thus the children could still have a relationship with family members.

As for Father's reference to how the children would be affected if Mother's rights to them were terminated but Mother was still visiting their baby brother during the pendency of the case involving the baby, Hodridge testified that such might affect the children and therefore the Department "would also make sure that we also have therapy and counseling set up for them to help them understand what is taking place." However, regardless of what happens with Mother's rights to the baby, the children will be affected and need to have the situation explained to them. If they were returned to Father, they would be separated from both Mother and their new brother. Father does not explain how he would help the children understand what was happening or cope with it, and he put on no evidence of any plan to allow the children to have a relationship with their brother.

Further, although Roberson testified that Father had recently provided her with a plan for what he wanted for his children, she was not asked and did not testify about what was in the plan. Father did not testify about the contents of any plan and did not produce any exhibits showing the plan. Accordingly, the trial court had no evidence before it of the plan's contents. Father had not been released from the halfway house by the time of trial, and Father produced no evidence of what he planned to do with

45

the children in the meantime if the trial court had returned the children to him at that point.

Additionally, Roberson testified that because Father had only been recently released from the Glossbrenner Unit, she has not been able to monitor Father to see if he can maintain sobriety and that "[p]arents always are sober when they're in drug treatment or in drug facilities in prison." She further stated that neither parent could, at that point, truly parent the children due to "what's going on in their life today" and that it was unfair for the children to have to keep waiting for their parents. Although Father asserts that if his Extension Motion had been granted, the Department would have had a chance to monitor his ability to stay clean and to provide the children with a home, it was Father's own actions that led to his incarceration. It was thus Father's actions that created the situation in which he had only a short period of time to show his ability to provide a stable, drug-free home.

Regarding Father's downplaying of the effect that his domestic violence against Mother had on the children, domestic violence affects children even when they do not witness it. In this case, as noted above, Father's acts resulted in his incarceration. Because of that incarceration, the children were unable to see their Father for nearly eight months, and, at least of the time of trial, Father could not provide a home for them. Further, although Father states that he has learned how to control his emotions, the trial court was permitted to consider that Father's past behavior was a better predictor of his future behavior than his recent behavior. *See In re A.S.*, No. 04-14-

00505-CV, 2014 WL 5839256, at *2 (Tex. App.—San Antonio Nov. 12, 2014, pet. denied) (mem. op.).

Applying the applicable standards and scopes of review, we conclude that the evidence was legally and factually sufficient to enable the trial court to form a firm belief or conviction that terminating Father's parental rights to the children was in the children's best interest. We overrule Father's fifth issue.

## IV. Conclusion

Having overruled Mother's first, third, and sixth issues, and having overruled Father's first, third, and fifth issues, we affirm the trial court's order.

/s/ Mike Wallach

Mike Wallach
Justice

Delivered: March 24, 2022